UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
BAT, LLC,

                        Plaintiff,

        - against -

TD BANK, N.A.; HALIFAX SECURITY, INC. d/b/a
NORTH AMERICAN VIDEO; HALIFAX SECURITY,
INC.; NORTH AMERICAN VIDEO, INC.; LYDIA
SECURITY MONITORING, INC. d/b/a COPS
MONITORING; and INTEGRATED SECURITY
SYSTEMS,

                        Defendants.
------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND
ORDER
ADOPTING REPORT AND
RECOMMENDATION**
15-CV-5839 (RRM) (CLP)

        Plaintiff BAT, LLC ("BAT") brings this diversity action against defendants TD Bank,

N.A. (the "Bank" or "TD Bank"), Halifax Security, Inc., Lydia Security Monitoring, Inc.,

Integrated Security Systems, and their corporate alter-egos, alleging claims for, *inter alia*, breach

of bailment contract, gross negligence, and violation of New York Banking Law § 338.  (Fourth

Am. Compl. (Doc. No. 46) at 4–10.)[1]  Following a series of amended complaints and answers,

defendant TD Bank moved for leave to amend its most recent answer to assert five counterclaims

against BAT.  (TD Bank's Mot. to Amend Answer (Doc. No. 118).)  BAT opposed the motion,

(Pl.'s Mem. of Law in Opp'n (Doc. No. 119)), and moved to strike it from the record, (Pl.'s

Notice of Mot. to Strike (Doc. No. 121); Pl.'s Mem. of Law in Opp'n).  TD Bank then replied

and opposed BAT's motion to strike.  (TD Bank's Reply (Doc. No. 124).)

        Those motions were referred to the Honorable Cheryl L. Pollak, and before the Court is

her very thorough and comprehensive Report and Recommendation ("R&R").  Judge Pollak

---

[1] Unless otherwise noted, all citations to docketed submissions in this Order use ECF pagination.

recommends that leave to amend be denied as to all proposed counterclaims and that BAT's motion to strike be denied. (R&R (Doc. No. 140).) TD Bank timely filed an objection to the R&R, (TD Bank's Obj. to R&R (Doc. No. 141)), to which BAT responded, (Pl.'s Opp'n to TD Bank's Obj. to R&R (Doc. No. 143)).

For the reasons set forth below, the Bank's objections are overruled. Accordingly, the Bank's motion for leave to amend its answer is denied, and BAT's motion to strike is denied.

## BACKGROUND

The R&R's detailed discussion of the relevant factual background, to which there is no objection, is incorporated herein. (R&R at 2–11.) As this Court has conducted a *de novo* review of the record, the recitation below includes additional factual background relevant to the analysis herein.

BAT filed its operative complaint (the "Complaint") in September 2016. (Fourth Am. Compl. at 11.) In short, the Complaint alleges that TD Bank misplaced the property of Chaya and Yaakov Bienenstock, that the Bienenstocks assigned their claims against the Bank to BAT, and that BAT is therefore entitled to recover against the Bank for the value of the misplaced property. (*Id.* ¶ 2.) BAT alleges in relevant part: "On or about June 10, 2010, in exchange for valuable consideration," the Bienenstocks "entered into a Safe Deposit Box Lease Contract . . . with TD Bank" at its Avenue U branch in Brooklyn. (*Id.* ¶ 15.) Around the same time, "valuables in excess of $250,000" were placed into the box. (*Id.* ¶ 21.) Thereafter, the Bienenstocks continued to pay for and renew the lease every year until, in August 2012, the Bank was burglarized and the contents of the box were stolen. (*Id.* ¶¶ 17–18, 22, 25–26.) The Bienenstocks later assigned "all rights and claims" to BAT. (*Id.* ¶ 2.) As of the date of the

Complaint, the investigation remained ongoing and BAT had not recovered the valuables.  (*Id.* ¶¶ 23, 27.)

The Bank answered the Complaint first in October 2016 and then, with leave from the Honorable Marilyn D. Go, the Bank amended its answer in November 2016.  (TD Bank's Answer (Doc. No. 64); TD Bank's Am. Answer (Doc. No. 72).)  This latter answer is now the operative pleading.  In it, the Bank agrees with the contours of BAT's story: It acknowledges the opening of the safe deposit box, its annual renewal, the break-in and theft, and the ongoing investigation.  (TD Bank's Am. Answer ¶¶ 15, 18, 22–23, 25.)  However, the Bank denies or denies knowledge of the other allegations, including that BAT is the rightful assignee of the Bienenstocks and that valuables were placed in the box.  (*Id.* ¶¶ 2, 21, 26–27.)  Finally, it asserts affirmative defenses of, as relevant here, estoppel and unclean hands.  (*Id.* at 11.)

After over a year of discovery, the Bank now moves for leave to amend its answer again to assert counterclaims against BAT for fraud, conspiracy to commit fraud, unjust enrichment, unclean hands, and breach of contract.  (TD Bank's Mot. to Amend Answer; TD Bank's Proposed Countercls. (Doc. No. 118-3) ¶¶ 88–156.)  By way of relief, the Bank requests declarations voiding the lease contract, a declaration voiding the assignments to BAT, declarations otherwise establishing that the Bank has no obligations to the Bienenstocks or BAT, attorneys' fees, costs, and unspecified damages.  (TD Bank's Proposed Countercls. at 34–35.)[2]

As described in detail in the R&R, the Bank alleges the following in support of its counterclaims: In the mid-to-late 2000s, Helen Sieger, mother of BAT's sole member, Abraham Sieger, embezzled $9 million from a nursing-home company she controlled, Kingsbridge Heights Rehabilitation and Care Center ("Kingsbridge").  (*Id.* ¶¶ 14–17, 20.)  In June 2007, Ms.

---

[2] Citations to TD Bank's Proposed Counterclaims use the document's original pagination because the ECF pagination is illegible.

Sieger deposited a $10,000,000 teller's check in her name into a checking account at Flushing Bank owned by Tappat, Inc. ("Tappat"), a company formed to hold "diamond assets." (*Id.* ¶¶ 32–36.) Some months later, in early 2008, Ms. Sieger withdrew a check from the same account for substantially the same amount, and subsequently used it to purchase diamonds worth $7.2 million. (*Id.* ¶¶ 38, 41.)

Ms. Sieger's son, Abraham Sieger, who controls BAT, knew of the diamond purchase. (*Id.* ¶ 67.) In fact, Mr. Sieger co-owned Tappat with his sister, Chaya Brachfeld. (*Id.* ¶ 34.) Tappat never filed tax returns, never transacted business with Flushing Bank except through Ms. Sieger, and never documented the alleged diamond purchase or insured the diamonds. (*Id.* ¶¶ 39, 42–44.)

In 2009, based on allegations of misconduct in her management of Kingsbridge, Ms. Sieger was replaced by a state-appointed receiver, sued by the receiver for conversion, and subsequently indicted by New York state authorities for grand larceny and failure to comply with state workers' compensation laws. (*Id.* ¶¶ 18–21.) In January 2010, while out on bail, Ms. Sieger fled to Florida, where she remained until August, when she was caught by state investigators and arrested. (*Id.* ¶¶ 25, 27, 46.) During this time in early 2010, Ms. Sieger's legal troubles were known in the Brooklyn Hasidic community. (*Id.* ¶ 47.)

It was during her sojourn in Florida that, according to the Bank, Ms. Sieger orchestrated the alleged transfer of diamonds to the Bienenstocks. By this time, the diamonds were being held for Ms. Sieger in a safe deposit box owned by an unidentified woman whom she had come to no longer trust. (*Id.* ¶ 58.) Sometime in the spring of 2010, Ms. Sieger contacted longtime business associate Meyer Greisman – Chaya Bienenstock's father – and requested that he meet with her in Florida. (*Id.* ¶¶ 45–46, 51.) At the meeting, Ms. Sieger requested that Greisman

arrange to take possession of the unidentified woman's safe deposit box, which was held at TD Bank's Avenue U branch in Brooklyn.  (*Id.* ¶¶ 48–50.)  He agreed, despite not knowing the contents of the box.  (*Id.* ¶ 48–50.)  Upon returning to New York, Greisman instructed the Bienenstocks to open their own safe deposit box at the same Avenue U branch.  (*Id.* ¶ 51.)

On June 10, 2010, the Bienenstocks obliged Greisman's request and entered into an agreement with TD Bank to lease their own safe deposit box at the Avenue U branch. (*Id.* ¶¶ 52–53.)  Little is alleged about the details of the transaction.  Regarding the Bienenstocks' mental state at the time they leased their box, the Bank states that they "did not inquire regarding the logistics," (*id.* ¶ 98), and yet proceeded "knowing of Ms. Sieger's criminal conduct and history, and knowing that the [b]ox would be used to store her assets," (*id.* ¶ 102).  It further states that the Bienenstocks "knew or should have known that they were engaging in criminal and fraudulent conduct by opening the safe deposit box under these circumstances."  (*Id.* ¶ 105.)

Regarding potentially fraudulent representations, the Bank alleges that the "Bienenstocks materially misrepresented the purpose of opening the safe deposit box with TD Bank by representing that the [b]ox would be used for a lawful purpose, when in fact it would be used solely to store and hide contraband."  (*Id.* ¶ 103.)  While the Bank does not allege that the written agreement to lease the Bienenstock's safe deposit box contained a promise that the box would be used for lawful purposes, it does allege that such a promise is implicit pursuant to the implied covenant of good faith and fair dealing, and that the Bienenstocks knew of this when they opened the box.  (*Id.* ¶ 104.)  Finally, the Bank alleges that it "reasonably relied on the representations of the Bienenstocks that they had full authority to enter into the safe deposit lease contract and that they were doing so for a lawful purpose."  (*Id.* ¶ 105.)

Once the Bienenstocks had leased their own box, Ms. Sieger directed Greisman to go to the Avenue U branch on June 15 to meet with the unidentified woman. (*Id.* ¶¶ 57–58.) On June 15, both Greisman and the Bienenstocks arrived at the bank. At the direction of the unidentified woman, the Bienenstocks physically exchanged their empty safe deposit box with the safe deposit box the woman was holding, ostensibly on behalf of Ms. Sieger. (*Id.* ¶ 60.) The proposed counterclaims are silent as to what the woman did with the empty box. Greisman and the Bienenstocks left the bank, and they all claim that they neither knew of, nor discussed the contents of the safe deposit box they took from the unidentified woman. (*Id.* ¶¶ 71–72.)

Helen Sieger died on April 18, 2011, while in custody at Rikers Island. (*Id.* ¶ 62.) Mr. Sieger and Ms. Brachfeld, Helen's children, were appointed the administrators of her estate. (*Id.* ¶ 64.) Although Mr. Sieger was aware that his mother purchased over $7 million in diamonds, they valued the estate at $3 million. (*Id.* ¶¶ 64.) The estate's exposure stemming from Ms. Sieger's legal troubles far exceeded that amount. (*Id*. ¶¶ 20, 67.)

Also soon after Ms. Sieger's death, Greisman and the Bienenstocks retained an attorney to advise them in connection with the contents of the Bienenstock's safe deposit box. (*Id.* ¶¶ 68, 71–73.) To this point, Greisman, the Beinenstocks all claim that they never knew or suspected what was in the Bienenstock's safe deposit box, nor did they discuss it among themselves. (*Id*. ¶ 72.) In June 2011, the attorney hired a gem appraiser, who, together with the attorney, Greisman, and the Bienenstocks, visited TD Bank and appraised the value of the box's contents. (*Id.* ¶ 75.) According to the appraisal, the safe deposit box contained over $7 million in diamonds and over $400,000 in cash. (*Id.* ¶ 78.) Mr. Sieger subsequently reviewed the appraisal report and reimbursed Greisman's legal fees, but he did not seek to declare or possess the diamonds. (*Id.* ¶76, 79–80.) The Bank alleges that Mr. Sieger and Ms. Brachfeld, sought to

devalue Ms. Sieger's estate at the time of settlement discussions with New York State authorities related to the allegations against Ms. Sieger in connection with her nursing home business.[3]  (*Id.* ¶ 79.)

 Approximately one year later, in August 2012, the Avenue U branch was burglarized and, allegedly, the contents of the safe deposit box disappeared.  (*Id.* ¶ 81.)  At no time did the Bienenstocks report their discovery to Ms. Sieger's children or to law enforcement.  (*Id.* ¶ 66, 77.)[4]  Nearly three years after the burglary, in July 2015, the Bienenstocks, Tappat, and Ms. Sieger's estate assigned their claims against TD Bank to the newly created BAT,  (*id.* ¶¶ 82–85), which subsequently initiated this lawsuit.

## STANDARD OF REVIEW

In reviewing a Report and Recommendation, a district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  When a party properly objects to the magistrate's proposed findings and recommendations, a district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations."  *Id.*  By contrast, those portions of the magistrate's findings not properly objected to are reviewed only for clear error.  *See, e.g.*, *Jarvis v. N. Am. Globex Fund, L.P.*, 823 F. Supp. 2d 161, 163 (E.D.N.Y. 2011).

To lodge a proper objection, parties must not "simply relitigate[] . . . original arguments," *Antrobus v. N.Y.C. Dep't of Sanitation*, No. 11-CV-5434 (CBA) (LB), 2016 WL 5390120, at *1 (E.D.N.Y. Sept. 26, 2016), and neither should they raise arguments "which could have been, but [were] not, presented to the [m]agistrate [j]judge in the first instance,"  *Kennedy v. Adamo*, No.

---

[3] The attorney representing the Bienenstocks and Greisman, who also hired the appraiser, represented Helen Sieger and her estate in these negotiations.  (*Id.* ¶ 70.)

[4] The Bank makes no allegations as to whether Greisman reported the discovery to anyone.

02-CV-1776 (ENV) (RML), 2006 WL 3704784, at *1 (E.D.N.Y. Sept. 1, 2006) (citation omitted). In these situations, clear error review of the objected-to portions of the magistrate's findings is warranted. *See, e.g.*, *Antrobus*, 2016 WL 5390120, at *1.

Here, TD Bank objects to nearly all aspects of the R&R – except the analysis of BAT's motion to strike – advancing an array of arguments both recycled and new. BAT does not object, and has responded to the Bank's objections pursuant to Federal Rule of Civil Procedure ("Rule") 72(b)(2). Out of an abundance of caution, the Court has reviewed the entire recommendation *de novo*. Having done so, the Court adopts all of the recommendations set forth in the R&R, with modest modifications to the analysis to more fully address the Bank's objections. As the R&R recommends, and as this Court now adopts, the Bank's motion for leave to amend is denied, as it BAT's motion to strike.

## DISCUSSION

### I.     Leave to Amend

The decision to grant leave to amend pursuant to Rule 15 "is within the discretion of the District Court." *Forman v. Davis*, 371 U.S. 178, 182 (1962). Although Rule 15 admonishes courts to "freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), it does not thereby mandate that courts grant leave in the face of reasons to deny it. *Id.*; *see also Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (citing *Forman*, 371 U.S. at 182); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("Although Fed.R.Civ.P. 15(a) provides that leave to amend should be given freely when justice so requires, where, as here, there is no merit in the proposed amendments, leave to amend should be denied."). Reasons to deny leave include "futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v.*

*Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (citing *Forman*, 371 U.S. at 182).

In this case, BAT argued, and the magistrate judge concluded, that all five proposed counterclaims fail as futile.  (Pl.'s Mem. of Law in Opp'n at 16–17, 19–30; R&R at 18–34.)  "An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).  Therefore, an amendment is futile if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Long v. Parry*, 679 F. App'x 60, 63 (2d Cir. 2017).[5]

## II.      First Proposed Counterclaim: Fraud

---

[5] The Bank argues that the foregoing standard – the same announced in the R&R – is not complete, citing a group of district court cases for the proposition that "the non-movant bears the burden of demonstrating that the proposed amendment is improper."  (TD Bank's Obj. to R&R at 5–10 (citing *Torres v. DJ Southhold, Inc.*, No. 17-CV-5123 (SJF) (AYS), 2018 WL 3653271, at *3 (E.D.N.Y. July 12, 2018))); *see also Blaskiewicz v. Suffolk*, 29 F. Supp. 2d 134, 137–38 (E.D.N.Y. 1998); *Harrison v. NBD Inc.*, 990 F. Supp. 179, 185 (E.D.N.Y. 1998) (citing *Panzella v. Skou*, 471 F. Supp. 303, 304–05 (S.D.N.Y. 1979)).  Because BAT did not meet this burden, says the Bank, its motion must be granted.  (TD Bank's Obj. to R&R at 7.)  The Court disagrees.

Although the non-movant may, in view of Rule 15's permissive standard, be required to make a persuasive argument in order to effectively oppose amendment, these cases cannot be taken to mean that persuasive opposition is a necessary prerequisite for denial of leave to amend.  Sometimes, a proposed amendment may be "clearly frivolous or legally insufficient on its face," and in such circumstances, "[c]ourts should deny leave to amend."  *Ruiz v. Suffolk Cty. Sheriff's Dept.*, No. 03-CV-3545 (DLI) (ETB), 2008 WL 4516222, at *2 (E.D.N.Y. Oct. 2, 2008).  To hold otherwise would be to vitiate district courts' discretion and to go against the great weight of Supreme Court and Second Circuit precedent emphasizing that futility, prejudice, bad faith, and delay are the determining factors.  *See Forman*, 371 U.S. at 182 (emphasizing district courts' discretion and setting out reasons why leave to amend may be denied); *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("One appropriate basis for denying leave to amend is that the proposed amendment is futile."); *Ruffalo*, 987 F.2d at 131 ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."); *Health-Chem Corp.*, 915 F.2d at 810 ("[W]here, as here, there is no merit in the proposed amendments, leave to amend should be denied.").  None of these controlling cases even discusses whether the non-moving party has a burden to oppose amendment.  And unsurprisingly, the Court is aware of no cases granting leave to amend solely because the non-moving party failed to make an adequate showing in opposition.

In any event, the Court finds BAT has persuasively shown why leave to amend should be denied in this case.  As noted above, BAT raised a futility challenge to all five proposed counterclaims, (Pl.'s Mem. of Law in Opp'n at 16–17, 19–30), the magistrate judge recommended rejecting all counterclaims as futile, (R&R at 18–34), and this Court now adopts those recommendations.

To state a claim for fraud in the inducement under New York law, "the party must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [the party]; and (iv) resulting damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011) (citing *Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189, 195 (N.Y. 2007)). Additionally, to survive a motion to dismiss, the "party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This means the party must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402–03 (2d Cir. 2015) (citing *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)).

In reviewing the fraud pleading, the court must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 175–76 (2d Cir. 2015). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

The magistrate judge construed the first counterclaim as advancing two alternative theories: first, that BAT's assignors "fraudulently induced TD Bank to lease a safe deposit box to

the Bienenstocks without disclosing the unlawful purpose of the transaction," *i.e.*, to conceal the proceeds of Helen Sieger's embezzlement, (R&R at 18), and second, that "there was fraud involved in the creation of BAT and the assignment of the contents in the safe deposit box to BAT," (*id.* at 23).  The Court addresses each theory in turn.

### A.    Fraudulent Leasing Theory

#### a.    Scienter

The magistrate judge concluded, in part, that the Bank's proposed counterclaim fails to allege the necessary element of scienter. As she stated, "While the allegations may demonstrate that BAT or the assignors intended to deceive some other person or entity, nothing . . . suggests that anyone intended to deceive TD Bank."  (R&R at 22).  In its objections, the Bank argues that, in reaching this conclusion, the magistrate judge improperly drew inferences against the pleading and inappropriately held mental-state allegations to the heightened Rule 9(b) pleading standard. (TD Bank's Obj. to R&R at 16–19.)  While this Court reads the counterclaim to suggest that both Greisman and Ms. Sieger did have such intent, the pleading fails to allege scienter as to the individuals who actually contracted to open the box, that is, the Bienenstocks.  For this critical reason, the counterclaim fails.

While the Bank is correct that "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally," Fed R. Civ. P. 9(b), "this leeway is not a 'license to base claims of fraud on speculation and conclusory allegations.'" *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 187 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). "'[P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent,' which may be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *Acito*, 47 F.3d at 52).

Conversely, an inference of fraudulent intent cannot be established by alleging only "that the

defendants were aware that their statements were false when they were made" without any "facts

pleaded supporting that theory of knowing falsity." *Prickett v. N.Y. Life Ins. Co*., 896 F. Supp.

2d 236, 246 (S.D.N.Y. 2012).

The Bank's argument that the Bienenstocks knew of the scheme to conceal the proceeds

of Ms. Sieger's embezzlement, and therefore intended to defraud TD Bank by opening a safe

deposit box for an illegal purpose, rests on two sets of factual allegations and the inferences

drawn therefrom. First, the Bank alleges that the Bienenstocks opened the safe deposit box at the

direction of Chaya Bienenstock's father, Meyer Greisman. (TD Bank's Proposed Countercls. ¶¶

52, 102.) Elsewhere, the Bank alleges facts that, if accepted as true, show Meyer Greisman was

at least reckless as to the possibility that the safe deposit box would be used to conceal Ms.

Sieger's ill-gotten gains, including the following: Greisman traveled to Miami to meet Ms.

Sieger, with whom he had a personal relationship and who had recently skipped bail, (*id.* ¶¶ 25–

27; 45; 93–94); he met with her in a hotel room and did not question her unusual request that he

accept a safe deposit box from her, (*id.* ¶¶46–48; 93–94); and he subsequently arranged for the

exchange of boxes with an unidentified woman, (*id.* ¶¶ 49–53). Second, the Bank alleges that

"[i]n the spring of 2010, it was well-known in the Brooklyn-Hasidic community that Ms. Sieger

was involved in criminal activity and had been arrested." (*Id.* ¶ 47). Though the Bank does not

specifically allege as much, it is a fair inference that the Bienenstocks are members of this

community.[6]

---

[6] The Bank all but alleges that Mr. Greisman is a member of the community, (TD Bank's Proposed Countercls. ¶
47), and it does allege that he is the father of Chaya Bienenstock, (*id.* ¶51). In any event, the Court assumes for the
sake of argument that this fact is sufficiently well pleaded.

Taken together, and drawing all reasonable inferences in the Bank's favor, these allegations establish neither that the Bienenstocks had a motive to lie to TD Bank nor that they were reckless about the possibility of lying. *See Eternity Glob. Master Fund Ltd.*, 375 F.3d at 187 (quoting *Acito*, 47 F.3d at 52). There is no allegation that Greisman communicated anything to the Bienenstocks other than the simple instruction to lease a safe deposit box. Indeed, the allegation that the Bienenstocks "did not inquire regarding the logistics of the transfer" suggests that no such communication transpired. (TD Bank's Proposed Countercls. ¶ 95.) Nor is there an allegation that the Bienenstocks knew anything about Ms. Sieger's legal troubles or their father's relationship to Ms. Sieger, or even that they knew who Ms. Sieger was.

To attribute fraudulent intent to the Bienenstocks for the reasons asserted by the Bank, the Court would have to fill in these blanks – and more: that the Bienenstocks knew of Ms. Sieger, that Greisman informed them the box was to be opened on Ms. Sieger's behalf, and critically, that they learned sufficient details about Ms. Sieger's embezzlement and subsequent legal predicament – whether from Greisman or their community connections – such that they knew or should have known that opening the safe deposit box would further her illegal purposes. *See Eternity Glob. Master Fund Ltd.*, 375 F.3d at 187 (requiring a showing of either "motive and opportunity" or "conscious misbehavior or recklessness"). This exercise would go well beyond drawing permissible and reasonable inferences and would amount to speculation. *See Arar*, 585 F.3d at 567; *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 187 (although scienter may be "averred generally, this leeway is not a license to base claims of fraud on speculation and conclusory allegations" (internal quotation marks omitted) (citations omitted)).

All other allegations of scienter scattered throughout the proposed counterclaims are conclusory. The Bank alleges variously that the Bienenstocks "kn[ew] that [the box] would be

used to hide Ms. Sieger's contraband," (TD Bank's Proposed Countercls. ¶ 104), "knew of Ms. Sieger's criminal history and conduct," (*id.* ¶ 106), and "knew, should have known, or consciously avoided" the fact that "[t]he property that ultimately came into [their] possession . . . was illegally and improperly obtained," (*id.* ¶ 107). These allegations include no factual detail at all with respect to mental state – they do not specify how or when the Bienenstocks came to know these things. They simply urge that the Bienenstocks "knew." Such conclusory assertions are not entitled to the presumption of truth, *see Iqbal*, 556 U.S. at 678, and they cannot by themselves establish fraudulent intent, *see Prickett*, 896 F. Supp. 2d at 246 (holding fraudulent intent cannot be established by alleging only "that the defendants were aware that their statements were false when they were made").

Finally, the Bank urges that its allegations pertaining to the Bienenstocks conduct *after* opening the box support drawing an inference of fraud. (TD Bank's Obj. to R&R at 17–18.) But these allegations do not bear on the relevant issue: the Bienenstocks' fraudulent intent at the time they entered into the safe deposit lease contract. As the magistrate judge explained at length, and the Bank did not contest, New York law does not recognize a fraud cause of action for conduct related to the performance of contractual obligations – here the purported obligation to disclose an illegal purpose. (R&R at 15–16); *see also Middle Country Cent. Sch. Dist. v. J.F. O'Healy Constr. Corp.*, 646 N.Y.S.2d 379, 379 (2d Dep't 1996) ("A cause of action alleging fraud cannot be maintained when the fraud charged relates to a breach of contract."). The Bank must therefore rest any fraudulent inducement claim on allegations that bear on the Bienenstocks' state of mind at the time they signed the lease agreement. *Cf., e.g.*, *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, No. 02-CIV-1312 (LMM), 2002 WL 31426310, at *5 (S.D.N.Y. Oct. 29, 2002) (finding a failure to allege scienter when there was "no specific

allegation that [defendant] had already formulated an intent not to perform when the alleged misrepresentation was made"). Of course, it is possible that allegations of suspicious conduct during the performance of a contract could support an inference of fraudulent intent in entering into that contract; but here, in view of the thin allegations of pre-contracting scienter, allegations about what the Bienenstocks may have later deduced do not carry the day.

For the reasons discussed above, the Court finds the Bank's allegations, viewed "in the light most favorable to the plaintiff," *Arar*, 585 F.3d at 567, are insufficient to raise "a strong inference of fraudulent intent," *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 187 (quoting *Acito*, 47 F.3d at 52).

### b. Other Elements

Because the Bank fails to plead scienter, it cannot plausibly state a claim for fraudulent inducement. *See Iqbal*, 556 U.S. at 678. And as such, the Court need not address the remaining elements of this claim. *See, e.g.*, *Crowley v. Colvin*, No. 13-CV-1723 (AJN) (RLE), 2014 WL 4631888, at *5 (S.D.N.Y. Sept. 15, 2014) (declining to adopt portions of a report and recommendation not necessary to the disposition); *Renelique v. Doe*, No. 99-CIV-10425 (LTS) (HBP), 2003 WL 23023771, at *2 (S.D.N.Y. Dec. 29, 2003) (same).

### B. Fraudulent Assignment Theory

The magistrate judge construed the counterclaim as advancing the alternative theory that "there was fraud involved in the creation of BAT and the assignment of the contents in the safe deposit box to BAT." (R&R at 23.) She then rejected this theory as insufficiently pleaded under the more stringent pleading requirements of Rule 9(b) and, in any event, unavailing given there is no separate cause of action for fraud that "relates to a breach of contract." (R&R at 24 (internal quotation marks omitted) (quoting *Mastropieri v. Solmar Constr. Co.*, 553 N.Y.S.2d

187, 189 (2d Dep't 1990)).)  The Bank objected to both of these conclusions, contending that its theory was sufficiently pleaded and that "the fraudulent assignment is separate and apart from the breach of contract claim as different facts (assigning of the claims, creation of BAT) are alleged and different relief is sought (declaration that the assignments are void)."  (TD Bank's Obj. to R&R at 26.)

Assuming without deciding that the assignments are wholly collateral to the lease contract, and upon *de novo* review, the Court agrees that the counterclaim falls short of alleging any sort of fraud.  The Bank simply does not allege two basic elements of fraud: that it relied upon the assignments, or that it was injured by them.  *See Johnson*, 660 F.3d at 143 (citing *Ross*, 868 N.E.2d at 195).  It does allege, in conclusory fashion, that the assignments "were created for the *purpose* of defrauding TD Bank . . . into relying on [them] so that BAT and Mr. Sieger could profit," (TD Bank's Proposed Countercls. ¶ 121 (emphasis added)), but this goes to intent, not to actual reliance or injury.

To the extent the Bank is alleging that this litigation is itself the injury suffered, "'damages attributable solely to the existence of litigation are clearly insufficient to sustain the necessary element of damages' in a fraud claim."  *Hayden Capital USA, LLC v. Northstar Agri Indus., LLC*, No. 11-CV-594 (DAB), 2012 WL 2953055, at *4 (S.D.N.Y. 2012) (quoting *Raymond Corp. v. Coopers & Lybrand*, 482 N.Y.S.2d 377, 379 (3d Dep't 1984)).

Thus, under its fraudulent assignment theory, as under its fraudulent inducement theory, the Bank's first proposed counterclaim fails to state a claim.  *See Iqbal*, 556 U.S. at 678.

## III.    Second Proposed Counterclaim: Conspiracy to Commit Fraud

The Bank's second proposed counterclaim alleges conspiracy to commit fraud.  As the magistrate judge acknowledges, and as the Bank itself agrees, a claim for conspiracy "cannot

stand alone, but stands or falls with the underlying tort."  (R&R at 24–25 (quoting *Romano v. Romano*, 767 N.Y.S.2d 841, 842 (2d Dep't 2003)); *see also* TD Bank's Obj. to R&R at 21–22.)

"Under New York law, conspiracy, per se, is not a tort."  *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981) (internal quotation marks omitted) (citations omitted).  "Since civil conspiracy is a derivative claim under New York law, a claim for conspiracy should be dismissed if the underlying tort claim either is not adequately pleaded or has been dismissed." *Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, No. 99-CV-9623 (RWS), 2007 WL 1040809, at *25 (S.D.N.Y. Apr. 4, 2007), *aff'd sub nom. Briarpatch Ltd. LP v. Phoenix Pictures, Inc.*, 312 F. App'x 433 (2d Cir. 2009).  Because the Bank's proposed amendment fails to state a claim for fraud, as discussed above, it also fails to state a claim for conspiracy to commit fraud.[7]

## IV.    Third Proposed Counterclaim: Unjust Enrichment

The Bank's third proposed counterclaim alleges unjust enrichment.  The magistrate judge concluded that the Bank's allegations were either too vague or too speculative to state a claim. (R&R at 26–28.)  This Court agrees.

Unjust enrichment is a quasi-contract claim designed to prevent "a person [from] enrich[ing] himself unjustly at the expense of another."  *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009).  "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted); *see also Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011).

---

[7] Given that conspiracy to commit fraud is not in itself a cause of action in New York, the Court does not address whether the conspiracy counterclaim is duplicative of the fraud counterclaim.  (*See* R&R at 25; TD Bank's Obj. to R&R at 22.)

Here, the bulk of the Bank's pleading states the elements of unjust enrichment and nothing more. For example, the Bank alleges that "BAT . . . engaged in conscious, intentional, and willful tortious conduct, and it would be unconscionable for BAT to retain the benefit of such conduct," and that "[a]s a direct and proximate cause of BAT's unjust enrichment, TD Bank has suffered injury." (TD Bank's Proposed Countercls. ¶¶ 144–45.) But "nowhere do[es] the Bank] explain how [BAT] was enriched, how the alleged enrichment came at [the Bank's] expense, or why this alleged enrichment was inequitable." *Washington v. Kellwood Co.*, No. 05-CV-10034 (DAB), 2009 WL 855652, at *11 (S.D.N.Y. Mar. 24, 2009). Without more explanation, the Bank's "threadbare recitals" stop far short of the line between possibility and plausibility. *See Iqbal*, 556 U.S. at 678.

The only specific allegations suggest that BAT was enriched from the hypothetical future resolution of this case in BAT's favor. (TD Bank's Proposed Countercls. ¶ 143.) Such allegations show nothing more than "sheer possibility," *Iqbal*, 556 U.S. at 678, and therefore they are not enough to state a claim. "An allegation premised on an unnamed benefit that may accrue in the future . . . is too slender a reed on which to premise a claim of unjust enrichment." *Regnante v. SEC Officials*, 134 F. Supp. 3d 749, 773 (S.D.N.Y. 2015) (citing *Kaye*, 202 F.3d at 616).

## V.     Fourth Proposed Counterclaim: Unclean Hands

The Bank's fourth proposed counterclaim is for unclean hands. The magistrate judge recommended rejecting the claim because "[u]nclean hands . . . is not a cause of action." (R&R at 30 (quoting *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 749 F. Supp. 1243, 1254 (S.D.N.Y. 1990)).) In its objections, the Bank correctly notes that legal theories usually presented as defenses, including unclean hands, may also appear in counterclaims for declaratory

relief.  *See, e.g.*, *Rates Tech. Inc. v. Cablevision Sys. Corp.*, No. 05-CV-3583 (DRH) (WDW), 2007 WL 1176732, at *5 (E.D.N.Y. Apr. 20, 2007) (refusing to dismiss a counterclaim for a declaratory judgment on the basis of unclean hands); *see also Stewart-Warner Corp. v. Westinghouse Elec. Corp.*, 325 F.2d 822, 826 (2d Cir. 1963) (reversing the district court's decision to strike affirmative defenses and corresponding counterclaims for declaratory judgment).  And the Bank's counterclaim, though not an exemplar of clarity, makes clear that declaratory relief is what it seeks.  (TD Bank's Proposed Countercls. at 34–35.)

However, even construed as a counterclaim for declaratory relief, the Court nevertheless finds it futile.  In New York and elsewhere, the doctrine of "[u]nclean hands is an equitable defense to equitable claims."  *See, e.g.*, *In re Gulf Oil/Cities Serv. Tender Litig.*, 725 F.Supp. 712, 742 (S.D.N.Y. 1989); *Hasbro Bradley, Inc. v. Coopers & Lybrand*, 515 N.Y.S.2d 461, 463 (1st Dep't 1987).  When a plaintiff "seeks damages in an action at law, [the defendant] cannot avail itself of unclean hands as a defense."  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 607 (2d Cir. 2005); *see also Hasbro Bradley, Inc.*, 515 N.Y.S.2d at 463 ("Nor can [defendant] invoke the equitable defense of unclean hands in this action exclusively at law.").

In the instant action, BAT seeks only damages, (Fourth Am. Compl. at 11), which are the "traditional remedy at law," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1874 (2017) (Breyer, J., dissenting).  For this reason alone, the Bank's proposed counterclaim fails.[8]

## VI.    Fifth Proposed Counterclaim: Breach of Contract

The Bank's fifth proposed counterclaim is styled as a breach of contract claim, but in substance it appears to seek declaratory relief on at least three separate contract-related theories:

---

[8] The Bank objects that it is "inappropriate on a motion to amend" to consider the validity of the affirmative defenses it has asserted in its operative answer.  (TD Bank's Obj. to R&R at 31.)  The difficulty for the Bank is that it has put the validity of at least one of those affirmative defenses into question by attempting to bring it as a counterclaim for declaratory relief.  This counterclaim is unquestionably appropriate for the Court to consider.

first, that the lease agreement is void because BAT's assignors breached the implied covenant of good faith and fair dealing, (TD Bank's Proposed Countercls. ¶¶ 151–54); second, that the agreement is void as against public policy, (*id.* at 34–35); and third, that the parties never possessed the requisite shared intent to form a contract, (*id.* ¶ 155).[9]

For the reasons stated below, the Court finds all three theories to be insufficient to state a plausible claim for relief.

### A.      Implied Covenant of Good Faith and Fair Dealing

In New York, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). The covenant "prevents any party from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. [It] is employed when necessary to effectuate the intentions of the parties, or to protect their reasonable expectations." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (internal quotation marks omitted) (first quoting *Dalton*, 663 N.E.2d at 291; then quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990)). Accordingly, to state a claim for breach of the covenant, a party must allege "facts tending to show that the . . . defendants sought to prevent performance of a contract or to withhold its benefits from the plaintiff[]." *Lee Dodge, Inc. v. Sovereign Bank, N.A.*, 51 N.Y.S.3d 531, 533 (2d Dep't 2017).

The magistrate judge found that the Bank failed to make any of the requisite allegations, and it recommended finding futility on that ground. (R&R at 34.) The Court agrees with and adopts this finding.[10] The operative pleadings are in substantial agreement that the Bank's

---

[9] The magistrate judge does not address the latter two theories, and the Court considers them in the first instance under the *Twombly* and *Iqbal* standard.

[10] The Bank objects to the magistrate judge's analysis with respect to the parol evidence rule. (R&R at 32.) The rule is not necessary to the disposition of this issue, and the Court rejects the Bank's objection on this basis.

performance under the contract amounted to providing access to a safe deposit box and that the Bank's benefits comprised receipt of an annual fee. (Fourth Am. Compl. ¶¶ 15–18; TD Bank's Am. Answer ¶¶ 15–18.) Nowhere does the proposed amendment allege that BAT's assignors sought to prevent this performance or withhold annual payments.

The Bank objects that the magistrate judge reads the covenant too narrowly, pointing specifically to the oft-quoted proposition that the covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978) (quoting 5 Samuel Williston, LAW OF CONTRACTS § 1293 (rev. ed. 1937)). The Bank argues that "[a]ny reasonable person, in entering into a contract with a bank, would understand that the contract was only to be used for lawful purposes." (TD Bank's Obj. to R&R at 27.) Therefore, it says, allegations tending to show the BAT assignors' unlawful purposes establish a plausible claim for breach of the covenant.

No doubt this syllogism is sound as stated, but the Bank's proposition of law is overly broad. Countless authorities, some cited above, emphasize that the covenant exists to "effectuate the intentions of the parties," *Gaia House Mezz LLC*, 720 F.3d at 93, and to ensure that "contractual objectives [a]re achieved," *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 33 (N.Y. 2005) (dismissing a claim for breach of the covenant because there was "no dispute that the contractual objectives were achieved"). It does not "create obligations that go beyond those intended and stated in the language of the contract." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003). Even the two foremost cases reciting the Bank's proposition go on to define the covenant in these narrower terms. *See Dalton*, 663 N.E.2d at 291 ("[The covenant] embraces a pledge that neither party shall do

anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (internal quotation marks omitted) (citations omitted)); *Rowe*, 385 N.E.2d at 570 ("[A] party who asserts the existence of an implied-in-fact covenant bears a heavy burden . . . . [A] party making such a claim must prove . . . that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole.").

Moreover, the Bank points to no authority expanding the implied covenant of good faith and fair dealing to include a promise to refrain from using the contract in furtherance of an illegal purpose. This is not surprising, as the law in New York and elsewhere furnishes other well-known rules that protect contracting parties against lawbreaking counterparties. *See, e.g.*, *McConnell v. Commonwealth Pictures Corp.*, 166 N.E.2d 494, 496 (N.Y. 1960) (discussing the defense of illegality); *Alpha Interiors, Inc. v. Tulger Constr. Corp.*, 956 N.Y.S.2d 67, 69 (2d Dep't 2012) (same); RESTATEMENT (SECOND) OF CONTRACTS § 179 (AM. LAW INST. 1981) (describing the scope of the public policy doctrine).

### B.    Public Policy

"It is the settled law of [New York] (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object." *McConnell*, 166 N.E.2d at 496 (quoting *Stone v. Freeman*, 82 N.E.2d 571, 572 (N.Y. 1948)).

> To this well-established principle of law, however, there is an equally well-established exception. If a party to an illegal transaction turns over money or property to a third person for the use of the other party to the transaction, the latter can enforce the express or implied promise or trust of the third party to turn over the money or property, notwithstanding the fact that he could not have enforced payment or delivery by the party who voluntarily made the payment or deposit. A mere agent or depository of the proceeds of an illegal transaction will not be permitted to assert the defense of illegality in an action to recover the proceeds by a party to the illegal transaction.

*Sw. Shipping Corp. v. Nat'l City Bank of N.Y.*, 160 N.E.2d 836, 839 (N.Y. 1959). The facts in

*Southwestern Shipping* illustrate this exception. In that case, "the plaintiff orchestrated a scheme

to evade Italian foreign exchange licensing requirements. As part of the unlawful scheme, the

parties directed the defendant bank to transfer funds from one account to another, but the bank

mistakenly issued the funds directly to an individual who 'absconded' with the money." *Bild v.*

*Konig*, No. 09-CV-5576 (ARR) (VVP), 2014 WL 3015236, at *8 (E.D.N.Y. July 3, 2014) (citing

*Sw. Shipping Corp.*, 160 N.E.2d at 839). Applying the exception to these facts, the

*Southwestern Shipping* court concluded that the "defendant may not escape from its contractual

liability and the consequences of its own negligence, by asserting the illegality of the antecedent

agreement by reason of which it received the proceeds." *Id.* (quoting *Sw. Shipping Corp.*, 160

N.E.2d at 840).

The facts as alleged in the proposed counterclaims are materially indistinguishable from

those in *Southwestern Shipping*. Here, the Bank alleges that Ms. Sieger orchestrated a scheme to

hide embezzled money. (TD Bank's Proposed Countercls. ¶¶ 17, 41–61.) As part of the alleged

scheme, Ms. Sieger and Greisman arranged to transfer diamonds, and to this end they merely

directed the Bank, through the Bienenstocks, to open a safe deposit box. (*Id.* ¶¶ 45–61.)

Subsequently, bank robbers (quite literally) absconded with the alleged diamonds stored in the

box. (*Id.* ¶ 81.) Although TD Bank's liabilities in contract and negligence have yet to be

adjudicated, it is quite clear that, like the bank in *Southwestern Shipping*, it cannot escape

liability "by asserting the illegality of the antecedent agreement by reason of which it received"

the diamonds. *Bild*, 2014 WL 3015236, at *8 (quoting *Sw. Shipping Corp.*, 160 N.E.2d at 840).

The Bank is therefore not entitled to a declaration that the lease agreement was against public

policy.

## C.     Contract Formation

"[T]he existence of a binding contract is not dependent on the subjective intent of either [contracting party]." *Civilized People, Inc. v. Milk St. Cafe, Inc.*, 10 N.Y.S.3d 611, 612 (2d Dep't 2015) (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Co.*, 361 N.E.2d 999, 1001 (N.Y. 1977)).  "In determining whether the parties entered into a contractual agreement . . . it is necessary to look, rather, to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Id.*  Put differently, "courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds." *Minelli Constr. Co. v. Volmar Constr., Inc.*, 917 N.Y.S.2d 687, 688 (2d Dep't 2011) (quoting *In re Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 693 N.Y.S.2d 857, 860 (1999)).

The Bank alleges that "[a]t no time did TD Bank and the Bienenstocks have a meeting of the minds as to the purpose for which the Box was to be used," that "TD Bank did not and could not have understood that the contract . . . was for an unlawful purpose," and that "[t]he safe deposit box lease contract is void as a result."  (TD Bank's Proposed Countercls. ¶¶ 155–56; *see also* TD Bank's Obj. to R&R at 29–30.)  However, that the Bienenstocks may have had a subjective purpose to break the law is irrelevant.  What matters is the objective manifestations of the parties, *see Civilized People, Inc.*, 10 N.Y.S.3d at 612, and here the proposed counterclaim does not allege any misunderstanding.  To the contrary, it alleges that the Bienenstocks signed the Bank's lease agreement.  (TD Bank's Proposed Countercls. ¶¶ 52–53.)  And as noted earlier in this Order, the operative pleadings do not dispute the essential terms of that agreement.  *See supra*, Section VI.A.  In this case, "[t]here is no doubt that there was an objective meeting of the

minds when the . . . [a]greement[] [was] signed." *O'Brien v. Argo Partners, Inc.*, 736 F. Supp. 2d 528, 535 (E.D.N.Y. 2010), *aff'd*, 426 F. App'x 36 (2d Cir. 2011).

In view of the foregoing, under any legal theory, the fifth counterclaim does not allege a plausible claim for relief. *See Iqbal*, 556 U.S. at 678.

## VII.  TD Bank's Counterclaims

For the reasons set forth above in Parts II to VI of this Order, the Court finds that each of TD Bank's proposed counterclaims fails to state a claim. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570 (2007)).  And for those reasons, the Court finds that the Bank's motion for leave to amend its answer to add these claims is futile. *See Burch*, 551 F.3d at 126 (citing *Forman*, 371 U.S. at 182); *Dougherty*, 282 F.3d at 88.

## VIII. Motion to Strike

BAT moved to strike the Bank's motion for leave to amend its answer along with "all other immaterial, impertinent, or scandalous matter filed by TD Bank."  (Pl.'s Notice of Mot. to Strike at 1; Pl.'s Mem. of Law in Opp'n.)  The magistrate judge concluded that BAT's motion failed to identify the purportedly offending portions of the Bank's counterclaims and otherwise failed to show that striking any or all of the counterclaims would be warranted, and it recommended denying the motion.  (*Id.* at 34–38.)  After reviewing this portion of the R&R *de novo*, the Court adopts it in full.

## CONCLUSION

For the foregoing reasons, TD Bank's objections to Magistrate Judge Pollak's Report and Recommendation (Doc No. 140) are overruled.  As such, the Bank's motion for leave to amend its answer to add counterclaims (Doc. No. 118) is denied, and BAT's motion to strike (Doc. No. 121) is denied.

This action is re-committed to Magistrate Judge Pollak for all remaining pretrial proceedings.

SO ORDERED.

Dated: Brooklyn, New York
      September 28, 2018

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge