**HAHN EISENBERGER PLLC**
ATTORNEYS AT LAW

August 9, 2022

**Via ECF**
The Honorable Diane Gujarati
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: ***BAT LLC v. TD BANK, N.A., et al.* . E.D.N.Y. Case No. 15-CV-05839 (DG) (CLP)**

Dear Judge Gujarati:

We represent Plaintiff BAT LLC. We respectfully submit this pre-motion letter with respect to the following proposed motions: (i) for a finding of spoliation of evidence against defendants TD Bank, N.A. ("TD") and Halifax Security Inc. d/b/a North American Video ("Halifax"); (ii) to strike defendants' expert reports pursuant to *Daubert;* and (iii) seeking summary judgment against TD.

This action arises from the burglary of TD's branch located at 1602 Avenue U, Brooklyn, New York (the "Branch"), on the evening of August 5, 2012, and continued until early morning of August 6, 2012, during which 38 safety deposit boxes were compromised, and their contents stolen, including safety box number 198, which held millions of dollars worth of diamonds, in addition to other items (the "Box").

## I. Pertinent Background

### i. The 2009 TD/Halifax Contract

In 2003, an alarm system manufactured by Bosch was designed and installed at the Branch (the "Bosch System"). The Bosch System was designed to contact a 24 hour monitoring service in the event of a burglary. The Bosch System contained a wireless backup transmitter, which could contact the 24 hour monitoring service even if the telephone lines were disabled. In 2009, TD and Nexus Technologies Group ("Nexus") entered into a contract pursuant to which Nexus, *inter alia*, was to replace the Bosch System at numerous TD branches, including the Branch (the "2009 TD/Halifax Contract"). The contract was later assigned by Nexus to Halifax. The 2009 TD/Halifax Contract required Halifax to provide a wide range of services for TD, including installations of new alarm systems manufactured by DMP (the "DMP Alarm System"). The contract specifications included a DMP wireless transmitter for a cost of $215.02 (the "$215.02 Cell Backup"), but it was not installed.

TD claims that it does not have any documents from 2009 through 2012 concerning the video cameras at the Branch, the design, installation, or components of the DMP Alarm System, and the purchase of the DMP Alarm System, despite its requirement to maintain such records pursuant to the Sarbanes Oxley Act and general litigation hold requirements applicable to all persons and companies, public and private. Defendants did produce purchase orders, invoices and other documents *concerning other branches*, but claimed not to have such documents for the Branch.

**ii. The DMP Alarm System Communication Outages**

TD claims that from 2009 through the date of the Burglary, the DMP System generated numerous false alarms (the "False Alarms"), which resulted in an alarm each time TD experienced sporadic internet communications outages (the "Communications Outages"). Defendants' maintenance records do not evidence any attempt, by TD or Halifax, to remedy the cause of the Communication Outages.

**iii. Defendants Effectively Disconnected The Central Station Monitoring**

Rather than address the Communications Outages through the installation of the $215.02 Cell Backup, defendants programmed the DMP Alarm System, and instructed the 24-hour central station, to ignore the Communications Outages signals for 120 minutes, and then "bury" notice of such signals in a computer log that was not reviewed (the "Reprogramming"). Defendants' Reprogramming altered its system to avoid providing notice of such alarm signals to the live central station monitor and to the police.

**iv. The Burglary**

On August 5, 2012, at 8:45 p.m., burglars cut the Branch's telephone lines and T-1 lines which were unprotected in the basement. The wired telephone line and T-1 network lines were the only means utilized by the DMP Alarm System to communicate with the central station monitoring company, since the wireless $215.02 Cell Backup was not installed. The DMP Alarm System caused the 24-hour central station to receive alarm signals, but due to defendants' Reprograming, the signals were concealed in the computer files and the police were never contacted. After gaining access to the vault, the burglars stole the contents from 38 safe deposit boxes.

**v. Plaintiff's Claim and TD's Spoliation of Evidence**

Shortly after the Burglary, TD was notified of plaintiff's claims. TD was provided with a detailed list of all items in the Box valued at approximately $8 million. TD destroyed and/or failed to maintain the DMP alarm panel, video recordings, the Box, purchase orders and invoices concerning the security equipment installation at the Branch, and security design documents, contrary to its own written procedures. Likewise, Halifax either destroyed or failed to maintain documents and emails concerning the DMP Alarm System.

**II. The Court Should Sanction Defendants TD and Halifax For Spoliation**

This Court's power to impose sanctions for the spoliation of evidence derives from both Rule 37(b)(2) and the inherent powers of the Court. *Barsoum v. NYC Housing Authority*, 202 F.R.D. 396, 399 (S.D.N.Y. 2001) [cites and quotes omitted]. That inherent power includes the authority to impose sanctions. *Donato v. Fitzgibbons*, 172 F.R.D. 75, 81 (S.D.N.Y. 1997).

The courts consider three factors in deciding whether to impose a sanction and its severity: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. Degeorge*

*Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). The burden placed on the moving party ought not be too onerous, lest the spoliator be permitted to profit from its destruction. *Chan v. Triple 8 Palace, Inc.*, 2005 WL 1925579, 7 (S.D.N.Y. Aug. 11, 2005). Here, defendants' own admissions demonstrate that all three of these factors have been met.

The first factor is met if litigation was probable or reasonably anticipated at the time that the potentially relevant evidence was destroyed. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (citing *Kronisch v. United States*, 150 F.3d 112 (2nd Cir. 2001)). Here, TD and Nexus were aware of the Burglary, and TD was notified of plaintiff's claim shortly after the Burglary. As to the second factor, courts consider the party's level of intent or willfulness in the destruction of evidence. *Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*, 2002 WL 1203836 at *14 (S.D.N.Y. 2002). "Specific intent to thwart the litigation process is not necessary." *Chan*, 2005 WL 1925579, at *7. TD's and Halifax's actions were intentional and willful. As to the third factor, an inference can be made that the spoliated evidence contained information relevant to this litigation and detrimental to defendants.

## III. DEFENDANTS' PROFFERED EXPERTS TESTIMONY SHOULD BE STRICKEN

### A. General Principles

"The district court has a 'gatekeeping' function under Rule 702 to ensure 'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Emulsion*, No. 18-MD-2819 (NG)(LB), 2020 U.S. Dist. LEXIS 82723, *10, 2020 WL 2280144 (E.D.N.Y., May 5, 2020) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588, 597, 113 S. Ct. 2786 (1993)). As part of its "gatekeeping" function, the district court must determine (1) whether the witness is qualified as an expert, (2) whether the witness's opinion "is based upon reliable data and methodology," (3) whether the testimony is relevant because it will assist the trier of fact, and (4) whether the evidence's probative value is outweighed by the danger of unfair prejudice. *Id.* at 11-12. *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). The proponent of the expert evidence has the burden of showing that Rule 702's requirements have been satisfied. *Daubert*, 509 U.S. at 597. A proposed expert will be precluded from testifying as an expert "[w]hen the expert opinion is inadequately supported by data, methodology, or studies." *In re Emulsion*, 2020 U.S. Dist. LEXIS 82723, at *11. Expert testimony may be excluded where "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512 (1997). An expert opinion cannot be based on speculation or unrealistic assumptions. *In re Emulsion*, at *28. Speculation that is not based on specific knowledge of the subject matter is to be excluded. *Toomey*, 86 F. Supp. 3d at 207. Nor can expert testimony be based on "instinct." *Vale*, at *36.

### B. TD's Expert Lawrence J. Fennelly ("Fennelly") Is Not Qualified

Fennelly should be precluded from offering expert testimony for a number of reasons. First and foremost, he is not qualified. Fennelly opines: "On August 5-6, 2012 the TD Bank at 1602 Avenue U provided a reasonable and acceptable level of security, consisting of both electronic and physical security measures, and alarm monitoring that was consistent with existing TD Bank security guidelines, policies, practices and procedures, and was in compliance with generally accepted security standards for banks." But Fennelly's deposition reveals that he is totally unqualified to offer

such an "expert" opinion. Fennelly's "experience and expertise" was in crime prevention (Fennelly Dep. At 57), primarily regarding physical security at Harvard University, and not in any way related to electronic alarm security or security for safe deposit boxes (*Id.* at 16, 57). He lacks expertise in the issues relative to this case. S*ee* accompanying Rule 56.1 Statement. Also, a witness should not be qualified as an expert where, like Fennelly, he has no specific knowledge involving the area. *See Crowley v. Chait*, 322 F. Supp. 2d 530, 538 (S.D.N.Y. 2004).

In addition, Fennelly provides no basis for his opinion other than to say: "if it wasn't an accepted security practice for TD Bank, they wouldn't be implementing it." (*Id.* at 108.) This is the same as saying: "If TD Bank did it, it must be OK." There is no "reliable foundation" for his testimony.

With respect to other substantive issues, such as whether TD even followed the DMP Panel manufacturer's specifications, Fennelly repeatedly stated that we would have to ask TD's John Minster, for Fennelly himself had no idea. (*Id.* at 137, 90-92, 93-99.) That is unacceptable as expert testimony.

**C. The Court Should Exclude TD's Expert David Wolf ("Wolf") From Testifying As An Expert**

TD retained Wolf to opine regarding the value of the diamonds that were burglarized. First, Wolf's opinion lacks a scientific and evidentiary basis because Wolf considered only 28 of the 101 diamonds in making his valuation. (Wolf Dep. 171: 08-25, 185:10-16). Wolf stated: "I didn't want to do 101 diamonds. It would take forever" (Wolf Dep. 173:08-10).

Second, Wolf's opinion lacks a legal basis. Wolf erroneously claims that the measure of damages is based on the price by which the goods could be sold. But under New York law, the measure of damages is the fair market value by which the lost goods can be replaced. *See Dubiner's Bootery, Inc. v. Gen. Outdoor Adver. Co., Inc.,* 10 A.D.2d 923, 923 (N.Y.App. Div. 1st Dep't 1960). Wolf's opinion is also based on his conclusion that a huge discount should be applied because, as he claims, plaintiff's expert, Donald Palmieri, did not apply Uniform Standards of Professional Appraisal Practice ("USPAP") since he did not investigate ownership history. Report at 4. Throughout his report and deposition testimony, Wolf assumed that the diamonds were a "stash" that was deliberately concealed from the government and thus impacting on value, s*ee, e.g.*, Wolf Dep. at 27-29, 66-67, 96, because he had not seen any court order that had taken the diamonds into custody. *Id.* at 32-36. Wolf assumed erroneously that an attachment order had been issued against the diamonds. *Id.* But when shown the actual attachment order and vacate order for the attachment, all Wolf could say is that the meaning of these documents is "unclear." *Id.* at 29-30. There is in fact no attachment order against the diamonds.

Wolf was not shy in stating that a number of his conclusions were based, not on empirical data, but rather on "common sense," and "68 years of living on this planet." An expert may not base his conclusions on common sense. *Glowczenski*, at *25. Common sense is the province of the jury. *Id.*

Another fundamental flaw in the proposed testimony is Wolf's conclusion that Mr. Palmieri's valuation should be rejected because he did not follow USPAP. But Wolf admitted at his deposition that USPAP is mandatory for real estate appraisers only, not for the appraisal of diamonds. *Id.* at 55-57. Compliance with USPAP, according to Wolf and USPAP itself, is otherwise "voluntary." *Id.*

Wolf's conclusion is without any support in any treatise, article or other indicia of established practice.

**C. The Court Should Exclude Halifax's Expert David Vickery ("Vickery")**

Halifax retained Vickery to opine as to, among other things, whether Nexus (Halifax's predecessor) acted in a grossly negligent manner regarding the security system at the Branch. But Vickery lacks any qualification to proffer such expert testimony. His experience is as a salesman of security systems ("sales, marketing and design"). Vickery Dep. at 31-32; *see also* Rule 56.1 Statement. Vickery's experience as a salesman, marketer and designer of integrated systems does not qualify him to render an expert opinion here. *Vale*, at *36 (quoting FRE 702 Advisory Committee's note (2000 Amendments)).

**E. The Court Should Exclude Louis T. Fiore And Peter Giacalone From Testifying As Experts On Behalf of Defendants Lydia Security Monitoring Inc. d/b/a COPS Monitoring ("COPS") and Integrated Security Systems ("ISS")**

COPS's expert Louis T. Fiore ("Fiore") and ISS's expert Peter Giacolone ("Giacolone") lack the requisite expertise concerning banking law and banking security. Both of their opinions lack any legal or scientific basis. Their opinions seem to attempt to render a legal conclusion that banking alarm companies do not have a duty to abide by the banking law, and that they have no duty of care at all. Both opinions amount to an unsupported legal conclusion that COPS and ISS have no liability because they followed TD's instructions. "Just following orders" is not a defense for failing to abide by the law or for failing to exercise reasonable care applicable in the industry. Moreover, Fiore's opinions are based on incorrect assumptions concerning the DMP Alarm System and whether it was UL Listed (Fiore Tr. 27:06-08). Both the DMP Alarm System and COPS's monitoring systems were UL listed. In fact, COPS even holds itself out on its website to be UL certified. This error is significant because Fiorie admits that the Communication Outages alarms are considered an "alarm" by the parameters dictated by the UL (Fiore Tr. 26:23-27:05), and that that an alarm requires the central station to make two telephone calls to determine if the police should be called. (Fiore Tr. 51:06-52:07; 53:19-23).

**IV. <u>The Court Should Grant Plaintiff Summary Judgment Against TD</u>**

The law regarding TD's duties and obligations to its safety deposit box renters is well settled. TD failed to return the goods entrusted to it by plaintiff, and, under the facts in this case, plaintiff can show that TD's negligence led to the success of the Burglary. *See* 9 N.Y. Jur. 2d Banks § 286 (2018). As set forth above, and which will be presented in further detail during motion practice, TD's security decisions, such as the failure to account for a burglar cutting its phone lines, while deciding to forego installing the $215.02 Cell Backup, and the election to have such an event essentially ignored by its monitoring company, was highly reckless, beyond the reasonable standard of care for a banking institution holding tens of millions of dollars of customer assets, and certainly negligent. Under classic bailor-bailee law, TD is liable as a matter of law to plaintiff for negligence, and for breach of the bailment contract.

Very truly yours,

/s/Elliot Hahn (EH-6087)